# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

KP BUILDING PRODUCTS, INC., a Delaware
Corporation, and KAYCAN, LTD, a Canadian
Corporation,

        Case Number: 08-CV-11520

       Plaintiffs/Counter-Defendants,    JUDGE PAUL D. BORMAN
                                                      UNITED STATES DISTRICT COURT

v.

CIRAULO BROTHERS BUILDING CO., d/b/a
SQUARE DEAL BUILDING SUPPLY, a
Michigan Corporation,

       Defendant/Counter-Plaintiff.
_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)

Now before the Court is plaintiffs/counter-defendants', KP Building Products ("KP") and Kaycan Ltd. ("Kaycan") (collectively "Plaintiffs/Counter-Defendants"), July 17, 2008 Motion to Dismiss defendant/counter-plaintiff Square Deal Building Supply's ("Square Deal or Defendant/Counter-Plaintiff") Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 21). A hearing on this matter was held on December 11, 2008. For the following reasons, the Court DENIES Plaintiffs/Couter-Defendants' Motion to Dismiss Defendant/Counter-Plaintiff's Counterclaim pursuant to Rule 12(b)(6).

### I.    BACKGROUND

This action arises from Plaintiffs/Counter-Defendants' Complaint that Defendant/Counter-Plaintiff breached contracts for the sale of goods and provisions of credit. This opinion relates to Defendant/Counter-Plaintiff's counterclaim that Plaintiffs/Counter-Defendants breached an

exclusive distribution agreement that it entered into with Defendant/Counter-Plaintiff. Plaintiff/Counter-Defendant filed the instant motion in response to Defendant/Counter-Plaintiff's counterclaim.

KP is a Delaware corporation with its principal place of business in Williston, Vermont. (Am. Countercl. ¶ 2). Kaycan is a Canadian corporation with its principal place of business in Pointe-Claire, Quebec. (*Id.* ¶ 3). KP and Kaycan manufacture building supplies, including aluminum and other siding materials and accessories, and sell those products in Canada and throughout the United States. (Compl. ¶ 14). Square Deal is a Michigan corporation engaged in selling and distributing building supplies to residential contractors and distributors. (Am. Comtercl. ¶ 1, 11). Its principal place of business is in Sterling Heights, Michigan. (Compl. ¶ 8).

Beginning in December 2005, Defendant/Counter-Plaintiff and KP began a commercial relationship with one another. Prior to this time, Defendant/Counter-Plaintiff had purchased vinyl siding from Louisiana-Pacific Corporation, but in December 2005, KP purchased Louisiana-Pacific's vinyl siding business.

According to Plaintiffs/Counter-Defendants, as a condition for shipping product prior to payment, KP requested Defendant/Counter-Plaintiff to enter a credit account arrangement. (Compl. ¶ 16). Plaintiffs/Counter-Defendants claim that on December 16, 2005, Vince Ciraulo, President of Defendant/Counter-Plaintiff, signed the credit agreement, which acknowledges that unpaid balances on Defendant/Counter-Plaintiff's account will be subject to an eighteen percent annual interest rate. (*Id.* ¶¶ 16–17).

Defendant/Counter-Plaintiff began ordering goods from KP in early 2006. (*Id.* ¶ 19) Plaintiffs/Counter-Defendants claim that the parties formed a contractual relationship through the

following activities:(1) Defendant/Counter-Plaintiff periodically submitting purchase orders; (2) KP sending written acknowledgments of the purchase orders and shipping the goods in a timely manner, with shipping receipts and bills of lading; (3) Defendant/Counter-Plaintiff signing the shipping receipts and occasionally noting when the goods were damaged or non-conforming; and (4) KP sending invoices at the time the product was shipped. (*Id*.).

According to Defendant/Counter-Plaintiff, though, it only began ordering products from Plaintiffs/Counter-Defendants after a February 2006 meeting between Lionel Dubrofsky, the President of both KP and Kaycan, and Ciraulo, while both men were attending a trade show in Florida. (Am. Countercl. ¶ 14). At that meeting, Dubrofsky allegedly promised Ciraulo that the terms of Defendant/Counter-Plaintiff's existing business arrangement with LP would remain the same and continue between Defendant/Counter-Plaintiff and Plaintiffs/Counter-Defendants. (*Id*. ¶ 16). Plaintiff claims that "as an additional term and condition for the contractual relationship between [the parties]," Dubrofsky orally promised to sell KP's and Kaycan's products exclusively to Defendant/Counter-Plaintiff and not to sell such products to other residential contractors or distributors within the State of Michigan." (*Id*. ¶ 17). Lastly, Dubrofsky allegedly promised Ciraulo that within one year KP would introduce a new line of metal accessories to be used with its vinyl siding products. (*Id*. ¶ 18).

Plaintiffs/Counter-Defendants claim that from October 2007 through December 2007, Defendant/Counter-Plaintiff ordered and received products from KP. (Pl.'s Compl. ¶ 22). Also, in late fall 2007, Defendant/Counter-Plaintiff ordered and received products from KP that was shipped from and billed by KP's associated company, KP Building Products Ltd (*Id*. ¶ 25). Plaintiffs/Counter-Defendants claim that as of March 31, 2008, Defendant/Counter-Plaintiff owed

3

$25,535.68 to KP Building Products Ltd. and $95,479.65 to KP on unpaid invoices, all of which was significantly past due according to the parties' credit agreement and the agreed terms of payment. (*Id.* ¶¶ 24, 31). In total, Plaintiffs/Counter-Defendants claim that Defendant/Counter-Plaintiff owes KP $121,015.33, plus contractually agreed interest of approximately $4,762.46 as of April 8, 2008. (*Id.* ¶¶ 24, 31).

In addition, Plaintiffs/Counter-Defendants claim that Defendant/Counter-Plaintiff ordered goods from Kaycan, which Defendant/Counter-Plaintiff received and accepted in December 2007. (*Id.* ¶¶ 34–35). Kaycan then sent an invoice to Defendant/Counter-Plaintiff on December 17, 2007. (*Id.* ¶ 36). Similar to the relationship between KP and Defendant/Counter-Plaintiff, Plaintiffs/Counter-Defendants claim that the purchase orders, acknowledgments, shipping receipts, and invoices established, in writing and by course of conduct, a contractual relationship between Kaycan and Defendant/Counter-Plaintiff. (*Id.* ¶ 37). Plaintiffs/Counter-Defendants claim that Defendant/Counter-Plaintiff owes Kaycan $71,400.00, plus contractually agreed interest of approximately $3,362.83 as of April 8, 2008. (*Id.* ¶ 41).

On April 8, 2008, Plaintiffs/Counter-Defendants filed the instant action in this Court against Defendant/Counter-Plaintiff, alleging breach of contract, breach of credit agreement, and account stated. On May 5, 2008, Defendant/Counter-Plaintiff filed an answer and counterclaim against Plaintiffs/Counter-Defendants, alleging breach of contract and promissory estoppel against both KP and Kaycan. On August 8, 2008, the parties stipulated that Defendant/Counter-Plaintiff would file an amended answer and amended counterclaim by August 18, 2008. Defendant/Counter-Plaintiff filed its First Amended Answer, Special and Affirmative Defenses, and First Amended Counter-Complaint ("ACC") on August 19, 2008.

Plaintiffs/Counter-Defendants now move this Court to dismiss Defendant/Counter-Plaintiff's claims because Defendant/Counter-Plaintiff has failed to state a claim upon which relief can be granted.

### III.   ANALYSIS

#### A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the [claimant], accept its allegations as true, and draw all reasonable inferences in favor of the [claimant]." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). This "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 127 S. Ct. at 1974). A claimant's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965).

Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

### B.  Defendant/Counter-Plaintiff's Breach of Contract Claim Against KP and Kaycan

#### 1.  Pleading

Plaintiffs/Counter-Defendants argue that Defendant/Counter-Plaintiff has not adequately pled the necessary elements of its breach of contract counterclaim against both KP and Kaycan. The Court does not agree.

"Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)). Thus, in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to establish the elements listed above.

In its ACC, Defendant/Counter-Plaintiff alleges that

21. Counter-Defendant KP entered into a contract with Counter-Plaintiff Square Deal whereby Counter-Defendant KP agreed to terms and conditions including, but not limited to:
   a. providing Counter-Plaintiff Square Deal with a new line of metal accessories to be used with its vinyl siding products;
   b. providing Counter-Plaintiff Square Deal with exclusive distribution of its products in the State of Michigan whereby Counter-Defendant KP would not sell directly to other residential contractors or distributors besides Counter-Plaintiff Square Deal within the State of Michigan; and
   c. delivering high quality products to Counter-Plaintiff Square Deal.

    22.    Counter-Defendant KP breached its contract with Counter-Plaintiff Square Deal by:
- a. failing to provide Counter-Plaintiff Square Deal with a new line of metal accessories to be used with its vinyl siding products;
- b. selling directly to other residential contractors and distributors besides Counter-Plaintiff Square Deal within the State of Michigan;
- c. failing to deliver high quality products to Counter-Plaintiff Square Deal on numerous occasions.

23.    Counter-Defendant KP's breaches are material and have proximately caused Counter-Plaintiff Square Deal to lose customers and to sustain damages in excess of $75,000.00.

(Am. Countercl. ¶¶ 20–23).

Plaintiffs/Counter-Defendants first contend that Defendant/Counter-Plaintiff has not alleged contract formation and instead has only made conclusory allegations that KP and Kaycan entered into a contract with Defendant/Counter-Plaintiff by making various promises. Specifically, Plaintiffs/Counter-Defendants argue that the ACC does not allege what the consideration for these promises may have been or that there was any mutuality of obligation.

While Defendant/Counter-Plaintiff has not specifically stated that there was consideration or mutuality of obligation, it has alleged facts sufficient to allow this Court to make such a finding. Defendant/Counter-Plaintiff claims that prior to December 2005, it purchased vinyl siding from Louisiana-Pacific. It also claims that Lionel Dubrofsky, on behalf of Plaintiffs/Counter-Defendants, promised that Plaintiffs/Counter-Defendants and Defendant/Counter-Plaintiff would continue the existing business agreement that Defendant/Counter-Plaintiff maintained with Louisiana-Pacific. Therefore, at least implicitly, Defendant/Counter-Plaintiff agreed that it would purchase vinyl-siding from Plaintiffs/Counter-Defendants, just as it had from Louisiana-Pacific. In return, Defendant/Counter-Plaintiff would receive exclusive distribution rights of Plaintiffs/Counter-Defendants' vinyl siding in Michigan. Defendant/Counter-Plaintiff's other claims regarding the

7

various promises made by Dubrofsky—as quoted above—and the fact that Defendant/Counter-Plaintiff eventually did purchase vinyl siding from Plaintiffs/Counter-Defendants further supports its claims that these promises were supported by consideration and mutuality of obligation.

Plaintiffs/Counter-Defendants also contend that Defendant/Counter-Plaintiff has not defined the terms of the contract or alleged breach, causation or damages. In stating that Plaintiffs/Counter-Defendants breached by selling directly to other residential contractors and distributors besides Defendant/Counter-Plaintiff in Michigan and that as a result it lost customers, Defendant/Counter-Plaintiff sufficiently alleged breach, causation, and damages.

Construing the ACC in light most favorable to Defendant/Counter-Plaintiff and resolving all ambiguities in the non-moving party's favor, the Court finds the ACC contains direct and inferential allegations respecting all the material elements of a breach of contract claim in Michigan. As such, Defendant/Counter-Plaintiff has alleged a claim upon which relief can be granted. Federal Rule of Civil Procedure 8(a)(2) requires only that a pleading set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, Plaintiff has met its pleading burden by adequately alleging that a contract existed, the relevant terms were breached, and that it was injured as a result of that breach.

**2.   Statute of Frauds**

Plaintiffs/Counter-Defendants ask that regardless of whether Defendant/Counter-Plaintiff adequately pled its breach of contract claims against KP and Kaycan, the Court nevertheless should find that they are barred by the applicable Statute of Frauds—M.C.L. § 440.2201.

Michigan's version of the Uniform Commercial Code ("UCC") Statute of Frauds, M.C.L. § 440.2201, provides in pertinent part:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

MICH. COMP. LAWS § 440.2201 (2008).

Generally, contracts that contemplate the sale of goods are governed by the UCC and its applicable Statute of Frauds provision. Defendant/Counter-Plaintiff, however, argues that the agreements with KP and Kaycan were "essentially exclusive oral distributorship agreements,"[1] which, according to the Michigan Supreme Court's decision in *Lorenz Supply Co. v. Am. Std., Inc.*, 419 Mich. 610 (1984), are not subject to M.C.L. § 440.2201.

In *Lorenz*, the Lorenz Supply Company entered into a written agreement with American Standard whereby Lorenz agreed to purchase $420,000 worth of plumbing inventory from American Standard. *Id*. at 613. In addition, Lorenz claimed, and the jury found, that at the same time, the parties orally agreed that Lorenz was to become a preferred distributor of American Standard products in the Detroit area. *Id*. After a dispute arose concerning the performance of the inventory sale agreement, Lorenz filed suit against American Standard claiming breach of the written inventory sale agreement and breach of the oral distributorship agreement. *Id*. The *Lorenz* court found that the oral distributorship agreement was not a contract for the sale of goods within the

---

[1] As set forth above, Defendant/Counter-Plaintiff alleges that in February 2006, Plaintiffs/Counter-Defendants agreed to provide Defendant/Counter-Plaintiff with *exclusive distribution* of its products in the State of Michigan. That is, Defendant/Counter-Plaintiff claims that Plaintiffs/Counter-Defendants would not sell directly to any other residential contractor or distributor within Michigan.

meaning of Michigan Code,[2] because it did not specify a quantity nor was it a requirement or output contract. *Id.* at 615. As a result, the Michigan Supreme Court held that the oral distributorship agreement was not governed by Michigan's UCC provisions.

Plaintiffs/Counter-Defendants attempt to distinguish *Lorenz* from the instant action by advancing several different arguments.[3] First, and most importantly, Plaintiffs/Counter-Defendants

---

[2] Although the rule formulated in *Lorenz* clearly is the minority rule regarding distribution agreements, *see e.g.*, *Custom Commc'n Eng'g, Inc v. E.F. Johnson Co.*, 636 A.2d 80 (N.J. Super. Ct. App. Div. 1993) (citing several decisions interpreting case law from nine different states where the courts found that distributorships are to be treated as sale of goods contracts under the UCC), it still appears to be good law in Michigan.

Contrary to Plaintiffs/Counter-Defendants' argument at the hearing on this motion, the *Lorenz* holding does not appear to have been subsequently overturned by the Michigan Supreme Court's holding in *Neibarger v. Universal Corp., Inc.*, 439 Mich. 512, 536 (1992), which adopted the "predominant factor test" in determining whether a transaction primarily involves a sale of goods or of services. Even if it did overturn *Lorenz*, however, such a factual determination regarding the alleged contract at issue would not be appropriate at this stage in the litigation.

[3] Plaintiffs/Counter-Defendants also contend that (1) *Lorenz* is not applicable to the present case because it involved a preferred distributorship, unlike the alleged exclusive distributorship at issue here; and (2) under M.C.L. § 440.2306(2) exclusive distributorships are expressly subject to Article 2 of the UCC.

As to the preferred-exclusive distinction, Plaintiffs/Counter-Defendants give no reason as to why the Court should distinguish between a preferred distributorship and an exclusive distributorship. An exclusive distributorship agreement certainly more closely resembles a requirements or output contract than a preferred distribution agreement, but like the *Lorenz* court, this Court defers from implying such a term into the alleged agreement here. *Lorenz*, 419 Mich at 615 n.7 (noting that "[o]ther courts have refused to hold that a distributorship agreement contains an implied term that the seller will supply the buyer with its requirements") (citations omitted).

Regarding M.C.L. § 440.2306(2), it provides: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." Section 440.2306(2), however, only applies to contracts for the sale of goods. As indicated above, the Michigan Supreme Court in *Lorenz* held that those oral distribution agreements which are found not to be requirements or output contracts are not contracts for the sale of goods. *Lorenz*, 419 Mich at 615.

10

argue that Defendant/Counter-Plaintiff has not alleged that there was a wholly separate exclusive distribution agreement, and therefore *Lorenz* is distinguishable because the distribution agreement there was separate from any agreement for the sale of goods.  In support of their argument, Plaintiffs/Counter-Defendants cite Defendant/Counter-Plaintiff's ACC, which states that the exclusivity provision was "an additional term and condition for the contractual relationship between . . . Defendant/Counter-Plaintiff and . . . Plaintiffs/Counter-Defendants."  (Am. Countercl. ¶ 17).  While the Court agrees that Defendant/Counter-Plaintiff deeming the exclusive distributorship as "an additional term and condition" to an existing contractual relationship between the parties removes this case from the edict of *Lorenz*, the Court disagrees with Plaintiffs/Counter-Defendants as to the effect of that allegation.

In its ACC, Defendant/Counter-Plaintiff asserts that prior to December 2005, it purchased vinyl siding from Louisiana-Pacific but that in December 2005, KP purchased Louisiana-Pacific's vinyl siding business.  Defendant/Counter-Plaintiff further claims that in February 2006, at a meeting arranged by the president of Plaintiffs/Counter-Defendants, he promised Defendant/Counter-Plaintiff that "the terms of . . . Defendant/Counter-Plaintiff's existing business agreement with LP would remain the same between . . . Defendant/Counter-Plaintiff . . . and Plaintiffs/Counter-Defendants."    While those terms are not specifically set forth, Defendant/Counter-Plaintiff does allege—albeit rather vaguely—the terms and conditions that governed its relationship with Plaintiffs/Counter-Defendants, at least before any exchange of forms or shipment of product.

From Defendant/Counter-Plaintiff's own allegations, it is clear that the contractual relationship it maintained with Louisiana-Pacific was governed by Michigan's UCC, as it

contemplated the sale of goods—namely, vinyl siding. It is also appears that as alleged, KP became a party to that contractual relationship when it purchased Louisiana-Pacific's vinyl siding business and that the exclusive distribution provision was a modification to that contractual relationship. What is not clear, however, is whether the contractual relationship between Louisiana Pacific and Defendant/Counter-Plaintiff fell within Michigan's UCC statute of frauds. If it did, then under M.C.L. § 440.2209(3), the modification also would need to abide by the statute of frauds. *See* MICH. COMP. LAWS § 440.2209(3) ("The requirements of the statute of frauds section of this article (section 2201) must be satisfied if the contract as modified is within its provisions.") If it did not, however, then the modification only would need to follow the other requirements listed under M.C.L. § 440.2209—none of which appear to have been violated.

While it would seem as though the contractual relationship between Louisiana-Pacific and Defendant/Counter-Plaintiff likely would have implicated Michigan's UCC statute of frauds because the $1,000 threshold minimum likely would have been met, the Court cannot make such an assumption. Thus, at this point in the litigation with the factual record not yet developed, the Court finds that the statute of frauds is not grounds for dismissing Defendant/Counter-Plaintiff's breach of contract claim against KP.

Defendant/Counter-Plaintiff also alleges breach of contract against Kaycan. In its Complaint, though, Defendant/Counter-Plaintiff claims that only KP—a related but independent company of Kaycan—purchased Louisiana Pacific's vinyl siding business. Therefore, when Defendant/Counter-Plaintiff alleges that the terms of Defendant/Counter-Plaintiff's agreement with LP would remain the same between Defendant/Counter-Plaintiff and Plaintiffs/Counter-Defendants, Defendant/Counter-Plaintiff is effectively alleging a modification of the contractual relationship to

include another party—not an assignment of rights or a delegation of duties. Yet just like with KP, such a modification would have to be in writing and signed by Kaycan but only if the original agreement should have been in writing. As a result, at this early stage in the litigation, the Court cannot find that the statute of frauds is grounds for dismissing Defendant/Counter-Plaintiff's breach of contract claim against Kaycan.

Accordingly, the Court, at this early stage of the proceedings, denies Plaintiffs/Counter-Defendants' Motion to Dismiss Defendant/Counter-Plaintiff's breach of contract counterclaims against Plaintiffs/Counter-Defendants.

### B.     Promissory Estoppel Against KP and Kaycan

#### 1.     Pleading

Plaintiffs/Counter-Defendants argue that Defendant/Counter-Plaintiff's Promissory Estoppel claims are every bit as flawed as Defendant/Counter-Plaintiff's breach of contract counterclaims.

In Michigan, to establish a claim for promissory estoppel a party must demonstrate: (1) there was a promise; (2) the promisor reasonably should have expected the promise to cause the promisee to act in a definite and substantial manner; (3) the promissee did in fact rely on the promise by acting in accordance with its terms; and (4) the promise must be enforced to avoid injustice. *Novak v. Nationwide Mut. Ins.*, 235 Mich. App. 675, 686–87. "Moreover, to support a claim of estoppel, a promise must be definite and clear." *Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 552 (1992) (citations omitted).

In accepting Defendant/Counter-Plaintiff's allegations as true and drawing all reasonable inferences in its favor, the Court finds that Defendant/Counter-Plaintiff adequately pleaded the elements of a promissory estoppel claim under Michigan law. Defendant/Counter-Plaintiff submits

13

that Plaintiffs/Counter-Defendants promised Defendant/Counter-Plaintiff that if it ordered products from either KP or Kaycan, they would not sell their products to any other local contractors or distributors within the State of Michigan (Am. Countercl. ¶¶ 26, 41). Such a promise is clear and definite enough to support a claim for promissory estoppel.[4] In addition, KP allegedly promised Defendant/Counter-Plaintiff at the February 2006 meeting that it would provide Defendant/Counter-Plaintiff with a new line of metal accessories to be used with its vinyl siding products as further inducement to order products from KP.

To satisfy the second element, Defendant/Counter-Plaintiff alleges that the promise was specifically made to induce Defendant/Counter-Plaintiff to purchase products from Plaintiffs/Counter-Defendants. As to the third element, Defendant/Counter-Plaintiff claims that in reliance on this promise, and to its substantial detriment, it chose to order products from Plaintiffs/Counter-Defendants initially and then continued to order products from Plaintiffs/Counter-Defendants instead of from another manufacturer. Defendant/Counter-Plaintiff further asserts that despite its continued purchases from Plaintiffs/Counter-Defendants, Plaintiffs/Counter-Defendants not only sold their products to other contractors and distributors in Michigan, but KP even failed to provide Defendant/Counter-Plaintiff with the new line of metal accessories for the vinyl siding products. Finally, Defendant/Counter-Plaintiff alleges that it suffered damages as a result and that Plaintiffs/Counter-Defendants' promise should be enforced to avoid injustice.

---

[4] Plaintiffs/Counter-Defendants cite *Kamalnath* for the proposition that vague promises—like the promises it allegedly made to Defendant/Counter-Plaintiff—cannot support a promissory estoppel claim. In *Kamalnath*, the Michigan Court of Appeals, on a motion for summary disposition, held that the defendant's alleged "promise to use business expertise and experience" was too vague to support the defendant's promissory estoppel claim. 194 Mich. App. at 552. In the present case, the Plaintiffs/Counter-Defendants' promise to sell its products exclusively to Defendant/Counter-Plaintiff is not vague in comparison to that in *Kamalnath*.

In construing the ACC in the light most favorable to Defendant/Counter-Plaintiff, these factual allegations are enough "to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974. Although the Plaintiffs/Counter-Defendants are correct in stating that the doctrine of promissory estoppel is to applied cautiously in Michigan, at this point in the litigation, the Court only determines whether, given the allegations, it could apply the doctrine—not whether it should apply the doctrine.

### 2.     Effect of Michigan Statute of Frauds

Plaintiffs/Counter-Defendants contend that even if Defendant/Counter-Plaintiff sufficiently alleged a claim for promissory estoppel, its promissory estoppel claims are barred as a matter of law by the statute of frauds. They argue that Defendant/Counter-Plaintiff cannot avoid the statute of frauds by pleading its claim in equity in the alternative.

Unless otherwise indicated by the particular provisions of the UCC, an agreement governed by the UCC may be invalidated on the basis of the principles of law and equity, including estoppel. M.C.L. § 440.2301. Plaintiffs/Counter-Defendants claim that because the only statutory exceptions to Michigan's UCC statute of frauds, M.C.L. § 440.2201, are those included within the statute, the Court should find that estoppel is not an exception to M.C.L. § 440.2201.

It is true that recent Michigan Court of Appeals decisions courts have questioned whether promissory estoppel can ever override the general statute of frauds, M.C.L. § 566.132. *Crown Tech Park v. D&N Bank, FSB*, 242 Mich. App. 538, 548 n.4 (2000) (finding that legislative amendments to the statute of frauds, M.C.L. § 566.132, "clearly provide that a viable claim of promissory estoppel cannot be asserted in [certain] case[s]."); *Kelly-Stehney & Assocs., Inc. v. MacDonald's Indus. Prods., Inc.*, 254 Mich. App. 608 (2003), *vacated on other grounds and remanded*, 469 Mich.

15

1046 (2004) ("question[ing] the continued viability of utilizing a judicially created doctrine like estoppel to circumvent the plain language of the statute of frauds"and criticizing the Michigan courts for "creat[ing] gaping holes in the statute of frauds that are inconsistent with the express language of the statute and the policy supporting it"). But, at the very best, the issue is unsettled in Michigan. *Liberty Mut. Ins. Co. v. Consol. Elec. & Tech. Assoc. Corp.*, 2007 U.S. Dist. LEXIS 1791, at *7–9 (Jan. 10, 2007) ("[U]nder the current state of law in Michigan, a promissory estoppel claim is *not necessarily* barred by the absence of a writing that would otherwise be required by the statute of frauds."); *see also Opdyke Investment Co. v. Norris Grain Co.*, 413 Mich. 354, 365 (1982) (recognizing that the legal doctrine of "promissory estoppel [was] developed to avoid the arbitrary and unjust results required by an overly mechanistic application of the statute of frauds").

The parties have not shown, and the Court cannot find, that the law is any less unsettled as it pertains to the UCC statute of frauds, M.C.L. § 440.2201. In fact, the Michigan Court of Appeals, on at least one occasion, has held that a plaintiff's estoppel claim could prevent a defendant from asserting a statute of frauds defense under M.C.L.§ 440.2201. *Fairway Machinery Sales Co. V. Continental Motors Corp.*, 40 Mich. App. 270, 272 (1972).

Here, Plaintiffs/Counter-Defendants ask the Court to invoke the UCC statute of frauds to bar Defendant/Counter-Plaintiff's promissory estoppel claim. Given the unsettled state of law in Michigan regarding this issue, the Court declines to dismiss Defendant/Counter-Plaintiff's promissory estoppel claims at this early stage in the litigation.

### III.   CONCLUSION

Accordingly, the Court **DENIES** Plaintiffs/Counter-Defendants' Motion to Dismiss.

**SO ORDERED**.

                            S/Paul D. Borman
                            PAUL D. BORMAN
                            UNITED STATES DISTRICT JUDGE

Dated:  December 30, 2008

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 30, 2008.

                            S/Denise Goodine
                            Case Manager